******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LUIS CARABALLO ET AL. *v.* ELECTRIC BOAT
CORPORATION ET AL.
(SC 19182)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued October 27, 2014—officially released March 17, 2015*

*Wesley W. Horton*, with whom, on the brief, were
*Brendon P. Levesque* and *Michael S. Taylor*, for the
appellant (named defendant).

*John B. Farley*, with whom were *Robert D. Tobin*
and *Thomas J. Riley*, and, on the brief, *John P. D'Ambrosio*, for the appellees (defendant Lawrence and
Memorial Hospital et al.).

*Nathan Julian Shafner* filed a brief on behalf of the
appellee (plaintiff Gregory W. Gray).

*Zachary M. Delaney* filed a brief for the Connecticut
Business Industry Association, Inc., et al., as amici
curiae.

*Michael R. Kerin* filed a brief for the Connecticut
Hospital Association as amicus curiae.

*Opinion*

McDONALD, J. The fundamental issue in these appeals, which come to us by way of a joint reservation from the Workers' Compensation Review Board (board),[1] is whether, prior to the effective date of No. 14-167 of the 2014 Public Acts (P.A. 14-167), an employer's liability for hospital services is assessed on the basis of a determination by a workers' compensation commissioner of what it "actually costs" the hospital to render the services, as provided under General Statutes (Rev. to 2005) § 31-294d (d),[2] or on the basis of the hospital's published rates that it is required to charge "any payer" under General Statutes § 19a-646.[3] The named defendant, Electric Boat Corporation (Electric Boat), contends that the Workers' Compensation Commissioner for the Second District (commissioner) improperly concluded that these cases are controlled by *Burge* v. *Stonington*, 219 Conn. 581, 591, 594 A.2d 945 (1991), in which this court concluded that the "actually costs" language in the predecessor to § 31-294d (d) had been effectively repealed or preempted in 1973, when the legislature first regulated hospital rates. We conclude that the public health scheme governing hospital rates for payers generally controls the present cases.

This reservation arises in the context of the following stipulated facts and procedural history. The plaintiffs, Luis Caraballo and Gregory W. Gray (claimants), were employees of Electric Boat when they each suffered injuries compensable under the Workers' Compensation Act, General Statutes (Rev. to 2005) § 31-275 et seq., for which they were treated at the defendant hospitals, William W. Backus Hospital and Lawrence and Memorial Hospital, respectively. In each case, the hospital submitted a bill for its services to Electric Boat that conformed to the hospital's pricemaster list filed with the Office of Health Care Access, as is required under General Statutes §§ 19a-646 (b) and 19a-681. Electric Boat thereafter referred the hospital bill to a third-party bill reviewer, Fairpay Solutions, Inc. (Fairpay), for assistance in determining what it "actually costs" the hospital to render care to the claimant in each case. Electric Boat then paid each hospital in accordance with Fairpay's cost assessment, which in each case was significantly less than what had been billed by the hospital. In Caraballo's case, the hospital's billed charges were $47,481.61, and Electric Boat paid $20,271.47, while in Gray's case, the hospital's billed charges were $67,642.81, and Electric Boat paid $24,595.53.

As a result of this dispute, pursuant to § 31-294d (d), the hospitals sought to have the commissioner determine Electric Boat's liability for the hospital costs. See General Statutes (Rev. to 2005) § 31-294d (d) ("[a]ll disputes concerning liability for hospital services in workers' compensation cases shall be settled by the

commissioner in accordance with this chapter"). The parties stipulated, for the purposes of obtaining a prompt resolution of the cases, that the amounts paid by Electric Boat were the actual cost of providing services to the claimants. The hospitals argued that under chapter 368z of the General Statutes, which prescribes the parameters for deregulation of hospital rates, "[a]bsent a negotiated and formalized agreement on a discount rate . . . every payer must pay the hospital's published charges . . . ." The hospitals further argued "that the law allows no exception for employers of injured workers or their workers' compensation insurers." The hospitals contended that this court's decision in *Burge* supported their position that the public health scheme governing hospital rates was controlling. Electric Boat disputed the effect of *Burge* on the current schemes and contended that, "while the hospitals may bill the[ir] published rates, [§ 31-294d (d)] provides that employers need reimburse only what it 'actually cost[s]' the hospital to render the service to the injured workers, and that is a figure to be determined by the Workers' Compensation Commission [commission]."

The commissioner engaged in a comprehensive examination of the statutory origins of and developments in both the public health scheme governing hospital rate setting and the workers' compensation scheme governing employer liability for medical care generally and hospital services specifically. In particular, the commissioner examined that history and the parties' claims in light of this court's decision in *Burge*, wherein this court addressed the vitality of the actually costs language under the workers' compensation scheme subsequent to hospital rate regulation. The commissioner concluded that, under *Burge*, the public health scheme in effect before, during, and after the period at issue had implicitly repealed the commissioner's right to determine actual costs. He further rejected Electric Boat's position that legislative action taken since *Burge* had altered that status. Accordingly, the commissioner held: "The hospital rate provisions of § 31-294d (d) are no longer applicable. Employers and insurers must either negotiate lower rates with hospitals as provided by [c]hapter 368z, or they must pay the published charges." Electric Boat appealed from the decisions to the board, which reserved the cases for appellate review.[4] See footnote 1 of this opinion.

To resolve this issue of statutory construction, we note at the outset that, because we are not confronted with an agency's time-tested interpretation of the statutes at issue, we apply plenary review.[5] *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 746, 99 A.3d 1114 (2014). "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. . . . [W]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history

and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . .'' (Citation omitted; internal quotation marks omitted.) Id., 747; see also General Statutes § 1-2z. Neither party argues that the statutes at issue are plain and unambiguous,[6] so we may look to extratextual evidence to the extent that it is useful.

## I

## HISTORY OF HOSPITAL RATES GENERALLY AND AS APPLIED TO WORKERS' COMPENSATION CASES

To resolve this issue of statutory construction, it is necessary to have a basic understanding of the historical developments in the workers' compensation scheme governing employer liability for hospital care and in the public health scheme governing hospital rate setting. For clarity, we frame this discussion through the lens of three broad developments in the public health scheme: preregulation, regulation, and deregulation. We also place the *Burge* decision in this historical context, in the latter period of regulation.

## A

### Preregulation of Hospital Rates

In 1913, the first workers' compensation statutory scheme provided in relevant part: "The pecuniary liability of the employer for the medical, surgical, and hospital service herein required shall be limited to such charges as prevail in the same community for similar treatment of injured persons of a like standard of living when such treatment is paid for by the injured persons.'' Public Acts 1913, c. 138, § 7. Historical evidence suggests that the "like standard of living'' requirement was included to ensure that health care providers would not charge more for medical care because a deep-pocketed employer would be liable for payment. See *Burge* v. *Stonington*, supra, 219 Conn. 587–88; see also *Covey* v. *Honiss Oyster House, Inc.*, 117 Conn. 282, 284, 167 A. 807 (1933) ("[t]he purpose of the statute is to prevent charges for medical and surgical services to an injured employee being made at a higher rate than they otherwise would be because they are to be paid by the employer or his insurer''); *Beinotovitz* v. *National Iron Works*, 1 Conn. Comp. Dec. 623, 629 (1916) ("it was the intention of the legislature, as expressed in this [a]ct, that the employer should only be holden for such . . . treatment as might have been expected in like cases if there was no issue between master and servant'').

A different problem emerged, however, with respect to hospital services specifically. In the early twentieth century, care at most hospitals was divided into three wards: a general or "charity'' ward, in which patients were placed in a ward with numerous other patients and the charge for services was below the hospital's actual costs; a semiprivate ward, in which patients were

placed in a semiprivate room and the charge for services would cover the actual costs of the patient's stay; and a ward for private rooms, where patients paid a higher per diem fee for hospital care and also paid a separate charge for doctors' and nurses' fees. See *Burge* v. *Stonington*, supra, 219 Conn. 585–87; *Schillinger* v. *Yale Brewing Co.*, 3 Conn. Comp. Dec. I-181, I-181–82 (1919); *Carter* v. *Rowe*, 2 Conn. Comp. Dec. I-100, I-101 (1916); *Beinotovitz* v. *National Iron Works*, supra, 1 Conn. Comp. Dec. 629; *Johnson* v. *Spring Glen Farm, Inc.*, 1 Conn. Comp. Dec. 593, 594 (1916). Because members of the industrial working class generally lacked the funds to pay their hospital costs, they typically were placed in and paid the rates for care in the charity wards. *Burge* v. *Stonington*, supra, 585–86. "Not infrequently, [however] a hospital would admit injured workers to [a semiprivate room] and be paid only the fee for 'general ward' treatment. See, e.g., *Schillinger* v. *Yale Brewing Co.*, [supra, I-184–85] . . . *Malone* v. *H. R. Douglas, Inc.*, [1 Conn. Comp. Dec. 297, 298–99 (1915)]."[7] (Citation omitted.) *Burge* v. *Stonington*, supra, 587. Thus, under both circumstances, the hospitals incurred a loss, and the commissioners urged action by the legislature. Id., citing 1914 Conn. Public Documents vol. 1, pt. 2, doc. 15, p. 17; *Spencer* v. *New Haven Rendering Co.*, 4 Conn. Comp. Dec. I-229, I-233 (1921); *Schillinger* v. *Yale Brewing Co.*, supra, I-187.

In 1921, the legislature amended the workers' compensation scheme to include the language that is at issue in these appeals. The amendment provided in relevant part that "[t]he pecuniary liability of the employer for the medical and surgical service herein required shall be limited to such charges as prevail in the same community or similar communities for similar treatment of injured persons of a like standard of living when such treatment is paid for by the injured persons; *but the liability of the employer for hospital service shall be the amount it actually costs the hospital to render the service, said amount to be determined by the commissioner.* . . ." (Emphasis added.) Public Acts 1921, c. 306, § 3. The legislature did not, however, define "actually costs" or indicate the basis on which a commissioner should calculate actual costs.

In the decades that immediately followed, the Board of Workers' Compensation Commissioners urged the legislature to relieve the commissioners of responsibility for determining hospital rates. See Reports of the Board of Compensation Commissioners, No. 18 (1946), p. 9; No. 17 (1944), pp. 8–9; No. 16 (1942), p. 8; No. 15 (1940), p. 9. In the absence of such action, the commissioners, during this period, met with hospital and insurance officials each year to reach an agreement on uniform statewide hospital rates for weekly charges rather than leave actual cost determinations to the commissioners in individual cases. *Burge* v. *Stonington*, supra, 219 Conn. 588 and n.5. This rate setting, however,

preceded medical advances that gave rise to services beyond the basic care covered under a per diem or weekly rate, such as laboratory tests, blood transfusions, oxygen, and drugs. See *Tanner* v. *Walgren Tree Experts*, No. 748, CRD-8-88-7 (January 17, 1990).

B

Regulation of Hospital Rates

After hospital care evolved from the three ward system, "[h]ospitals historically received payment for services based upon reasonable costs incurred retrospectively. Under this method, hospitals were assured payment for the full costs of caring for patients, including direct costs, such as room and board, as well as diagnostic tests, surgical costs, and supplies. Administrative and capital costs were allocated to all patients for items such as physical plant, technology, interest expenses, professional training, and management." Legislative Program Review and Investigations Committee, Connecticut General Assembly, Health Care Cost Containment in Connecticut (February 1994) p. 52. As Connecticut's health care costs, including those for hospital services, began to soar, the legislature undertook a series of initiatives aimed at controlling hospital, as well as other medical, costs.

In 1973, the legislature created the Commission on Hospitals and Health Care (hospital commission), whose responsibility it was to oversee Connecticut's health care delivery systems and to, inter alia, review budgets and approve rate increases for hospitals. Public Acts 1973, No. 73-117, §§ 3, 10, 11, 16 (P.A. 73-117). In approving proposed rates, the hospital commission could consider a number of factors, including "necessary expenses of the institution or facility concerned, the effectiveness of its delivery of health care services, the quality of available health care, the duplication of service by institutions and facilities in the area served, the community or regional need for any particular function or service, and any other factors which the commission deem[ed] relevant." P.A. 73-117, § 12. The legislature excluded only one payer, the state, from the hospital rates authorized by the hospital commission, but also required the state's rate to compensate for various indirect costs of patient care and cost shifting.[8] Following the adoption of this scheme, commissioners routinely adopted hospitals' billed rates, approved by the hospital commission, for purposes of assessing an employer's liability for hospital care under General Statutes § 31-294, the predecessor statute to § 31-294d. See *Tanner* v. *Walgren Tree Experts*, supra, No. 748, CRD-8-88-7 ("[Workers'] Compensation Commission practice has accepted the [hospital commission] rates as conforming to the statutory community standard of [General Statutes (Rev. to 1987) §] 31-294").

In further cost containment reforms in 1984, the legis-

lature decided that hospital rates should be determined on the basis of a prospective payment system, known as the "diagnostically related group" (DRG) rate system. Public Acts 1984, No. 84-315 (DRG act). DRG rates were to be determined on the basis of an "average charge for services rendered given similar categories of illness." Legislative Program Review and Investigations Committee, supra, p. 53. The scope of the application of this cost averaging system was not entirely clear, and the legislature subsequently amended the statute to direct that DRG rates were to apply to "all payers except for Medicare and for medical assistance provided pursuant to chapters 302 and 308 . . . ." General Statutes (Rev. to 1987) § 19a-165f (a), as amended by Public Acts 1987, No. 87-443, § 5.

Despite this change, the DRG act created confusion in workers' compensation cases, a matter eventually addressed in *Burge*, because employers questioned whether they were responsible for paying the itemized rates previously approved by the hospital commission or the often higher DRG rates. Conn. Joint Standing Committee Hearings, Public Health, 1988 Sess., pp. 165–66. In 1988, the legislature amended both the public health and workers' compensation schemes to expressly provide that DRG rates were to apply in workers' compensation cases. Public Acts 1988, No. 88-357, §§ 3, 19 (P.A. 88-357). Specifically, § 31-294 was amended to add to the "actually costs" standard the following proviso: "in cases for which a standard fixed charge per case has been established pursuant to . . . [the DRG act] liability shall be the amount charged by the hospital using a fee schedule based on such fixed charge per case . . . ." P.A. 88-357, § 19; see also P.A. 88-357, § 3 ("workers' compensation payers shall pay for hospital services as provided in section 31-294 as amended by [the DRG act]"), codified at General Statutes (Rev. to 1989) § 19a-165f (a).

The DRG system of averaging costs met considerable resistance. Responding to that resistance in 1989, the legislature repealed the DRG act, and excised from § 31-294 the language dictating the application of DRG rates in workers' compensation cases. Public Acts 1989, No. 89-371, § 22 (P.A. 89-371). As a result, the basic framework of the legislative schemes in place prior to the DRG act effectively resumed. P.A. 89-371, §§ 14, 15, 17.

C

*Burge*

In *Burge*, this court considered the preceding history in connection with a question similar to that raised in the cases presently before us. Specifically, this court examined employer liability for hospital services under the workers' compensation scheme between 1984, when the DRG rates were adopted, and 1988, when DRG rates were expressly stated to apply to workers'

compensation cases. The employer in *Burge* had contended that, because its liability under General Statutes (Rev. to 1987) § 31-294 was limited to what the hospital services "actual[ly] cost," its liability was limited to the hospital's itemized rates, which previously had been approved by the hospital commission, and not the DRG rates, which imposed average costs and were considerably higher in that case than the itemized rates. *Burge* v. *Stonington*, supra, 219 Conn. 583–84. The board[9] relied on a decision issued in the previous year in which it had concluded that "[t]he 'actual cost' language ceased to be relevant after 1973 when all hospital rates became subject to the approval of the [h]ospital [c]omission."[10] *Tanner* v. *Walgren Tree Experts*, supra, No. 748, CRD-8-88-7.

In part I of this court's decision in *Burge*, it addressed the board's conclusion that the "actually costs" language ceased to be relevant after 1973. After reviewing the legislative and historical background of both schemes, the court concluded that the commissioners' "deference to hospital . . . rates was not only authorized, but required, by the legislature. In enacting [P.A. 73-117], the legislature *effectively preempted* the entire field of hospital rate setting, including the portion previously occupied by the workers' compensation commissioners. Having authorized the hospital commission to determine all hospital rates, the legislature cannot have intended to continue requiring the compensation commissioners independently to establish the actual costs of the hospital for services rendered to injured workers as distinct from other persons." (Emphasis added.) *Burge* v. *Stonington*, supra, 219 Conn. 590. The court further noted that allowing workers' compensation payers to pay a different rate than the general public would "defeat the implicit purpose of § 31-294 . . . ." Id., 590–91. The court therefore concluded in part I that "[P.A. 73-117] *effectively repealed* the 'actual cost' language of § 31-294 and required [workers'] compensation commissioners to defer to the hospital commission rates." (Emphasis added.) Id., 591.

In part II of the opinion, the court focused on employer liability following the enactment of the DRG act in 1984, which governed the case before it. The court first concluded that, because the DRG act then provided that the DRG "fee schedule shall be used for *all payers* except for Medicare and for medical assistance provided pursuant to chapters 302 and 308"; (emphasis added) General Statutes (Rev. to 1987) § 19a-165f (a), as amended by Public Acts 1987, No. 87-443, § 5; workers' compensation payers plainly were not excluded from paying DRG rates. In addition to this unambiguous language, the court noted that the legislative history to the 1988 amendment, which expressly had rendered DRG rates applicable to workers' compensation payers, unquestionably indicated that these amendments were "intended to clarify the ambiguity created when the

legislature enacted [the DRG act] without explicitly repealing the conflicting provisions of § 31-294." *Burge* v. *Stonington*, supra, 219 Conn. 595, citing 31 H.R. Proc., Pt. 24, 1988 Sess., pp. 8329–30, remarks of Representative Paul Gionfriddo (noting that amendment was "clarifying in nature"). Having established the scope of § 19a-165f (a) of the DRG act, the court concluded that, because that statute was enacted subsequent to the conflicting terms of § 31-294, "the DRG [a]ct further modified § 31-294 to require an employer to pay the DRG rate established by the hospital commission even though that rate is based upon a hospital's average cost per diagnosis instead of the costs of providing service to a particular patient." *Burge* v. *Stonington*, supra, 595–96. In a footnote appended to this conclusion, the court asserted: "Now that the DRG [a]ct has been repealed . . . § 31-294, *implicitly modified* by [P.A. 73-117], returns to its pre-DRG meaning." (Emphasis added.) Id., 596 n.12.

D

Post-*Burge*: Deregulation of Hospital Rates

In 1994, after the General Assembly's Legislative Program Review and Investigations Committee conducted a detailed study of health care costs in Connecticut, the legislature abandoned strict regulation and oversight of hospital rates and decided to allow the competitive market to largely control prices. Public Acts 1994, No. 94-9, § 1; see also Legislative Program Review and Investigations Committee, supra, p. iv. The hospital commission's power to approve billing rates for hospitals ended on April 1, 1994, but total deregulation occurred in stages. See Public Acts, Spec. Sess., May, 1994, No. 94-3, §§ 7, 8 (creating Office of Health Care Access as oversight body with more limited powers than hospital commission); Public Acts 2002, No. 02-101, §§ 1, 5, 17 (removing cap on hospital revenues); Public Acts 2010, No. 10-179, § 161 (repealing requirement that hospitals submit budgets to Office of Health Care Access). Nonetheless, the legislature required hospitals to file fee schedules and prohibited them from departing from those published rates, except under specific circumstances. General Statutes § 19a-646 (b). That scheme remains in effect and is applicable to the cases at hand. We note that, following this court's decision in *Burge*, the "actually costs" language survived various amendments to § 31-294 unrelated to employer liability for hospital costs, and was retained during a comprehensive reorganization of the Workers' Compensation Act, and reenacted as § 31-294d (d). Public Acts 1991, No. 91-32, § 12 (P.A. 91-32).[11]

II

WHETHER THE "ACTUALLY COSTS" LANGUAGE CONTROLS AFTER DEREGULATION OF HOSPITAL RATES

With this background in mind, we turn to the parties' arguments regarding the import of *Burge* and whether this court's conclusion that the "actually costs" language of § 31-294 was "effectively preempted," "effectively repealed," or "implicitly modified" by hospital regulation controls in this case. See *Burge* v. *Stonington*, supra, 219 Conn. 590, 591, 596 n.12. Electric Boat argues: (1) part I of *Burge* was dicta and therefore need not be followed;[12] (2) even if part I were not dicta, we should overrule that portion of the decision because it was wrongly decided; (3) even if the "actually costs" language was implicitly repealed in 1973, it was revived in either: (a) 1989, when the DRG act was repealed; (b) in 1991, when the legislature reenacted the actually costs language in § 31-294d as part of a reorganization of the Workers' Compensation Act that removed otherwise obsolete language;[13] or (c) in 1994, when hospital rates were deregulated, leaving no other administrative entity's rate determination with which the commissioner's actual costs determination would conflict; (4) the current schemes do not conflict, because § 19a-646 can be construed to regulate the duty of hospitals to *charge*, whereas § 31-294d (d) can be construed to regulate the duty of employers to *pay*; and (5) even if we were to conclude that §§ 19a-646 and 31-294d (d) irreconcilably conflict, then § 31-294d (d), as the more specific statute, must control over the broader statutes controlling hospital costs generally. In support of its view, Electric Boat also points to the 2014 amendment to § 31-294d, which provides for a formula for determining an employer's liability for hospital costs going forward, but provides for liability to be determined according to actual costs until those formulas are instituted. See P.A. 14-167.[14]

The hospitals offer a vigorous rebuttal to each of these arguments. They note that Electric Boat "ha[s] not and cannot produce [a single] bulletin, memorandum, [board] decision, court opinion, regulation, or scrap of historical documentation indicating that their proffered 'actual costs' analysis [wherein a commissioner makes a case-by-case determination of a particular patient's hospital costs] *has ever existed* in Connecticut." (Emphasis in original.) They also argue that, as a practical matter, imposing the cost accounting approach to hospital rate setting that Electric Boat seeks would undermine the legislative decision to instill a competitive market to control and contain hospital costs for all payers in Connecticut and lead to protracted workers' compensation litigation.

We note that *Burge* varyingly characterized the regulation of hospital rates, whether in 1973 or 1984, as having "effectively preempted," "effectively repealed," or "implicitly modified" the actually costs language in § 31-294. *Burge* v. *Stonington*, supra, 219 Conn. 590, 591, 596 n.12. Although *Burge* used these terms inter-

changeably, they may have vastly different legal consequences and limitations, as the parties' arguments suggest. See General Statutes § 1-1 (s) ("[w]hen a statute repealing another is afterwards repealed, the first shall not be revived without express words to that effect"); *Lily Lake Road Defenders* v. *McHenry*, 156 Ill. 2d 1, 8, 619 N.E.2d 137 (1993) (explaining different standard for revival when earlier statute is preempted versus implicitly repealed).[15] Because our decision today will apply to a limited class of cases in light of the 2014 amendment to § 31-294d (d), we conclude that it is neither necessary, nor especially useful, to resolve this case through the lens of the parties' multipronged arguments as to whether *Burge* controls and whether the "actually costs" standard has been revived at various points in time. For the reasons set forth subsequently in this opinion, a commonsense reading of the current statutory scheme, read in light of the history of the schemes previously discussed, reflects that the legislature has manifested a clear, consistent intent that the rates sanctioned under the public health scheme control.

We begin with the relevant text of the statutes in effect during the period at issue in these cases. Under the workers' compensation scheme, § 31-294d (d) provides in relevant part: "The pecuniary liability of the employer for the medical and surgical service required by this section shall be limited to the charges that prevail in the same community or similar communities for similar treatment of injured persons of a like standard of living when the similar treatment is paid for by the injured person. The liability of the employer for hospital service shall be the amount it actually costs the hospital to render the service, as determined by the commissioner . . . ."

Under the public health scheme, however, § 19a-646 (b) provides: "No hospital shall provide a discount or different rate or method of reimbursement from the filed rates or charges to any payer except as provided in this section." "Any payer may directly negotiate with a hospital for a different rate or method of reimbursement, or both, provided the charges and payments for the payer are on file at the hospital business office in accordance with this subsection. . . ." General Statutes § 19a-646 (c) (1). A "payer" is broadly defined in a manner that would include workers' compensation payers. General Statutes § 19a-646 (a) (4).[16] Additionally, the public health scheme imposes a civil penalty for a hospital's noncompliance with the dictates of § 19a-646. See General Statutes § 19a-681 (requiring hospitals to file current pricemaster list, i.e., its detailed schedule of charges for its services, with Office of Health Care Access and providing that, "[i]f the billing detail by line item on a detailed patient bill does not agree with the detailed schedule of charges on file with the office for the date of service specified on the bill,

the hospital shall be subject to a civil penalty of five hundred dollars per occurrence"). Thus, under the scheme applicable to the present case, the only time that a hospital may deviate from its published rates— or else be subject to a civil penalty—is when: (1) a payer has negotiated with the hospital to pay a different rate, or (2) the legislature has expressly provided different rates in the hospital scheme. In the second circumstance, even when payment is dictated under another statutory scheme—for instance, Medicare or Medicaid—the exclusion from chapter 368z was made explicit by the legislature. See General Statutes § 19a-646 (a) (4) (excluding Medicare and Medicaid from definition of " '[p]ayer' "); see also General Statutes § 19a-673 (specifying rate hospitals may charge to low income uninsured patients). No such exclusion is provided for a workers' compensation payer. Assuming, in accordance with the parties' stipulated facts, that what it "actually costs" a hospital to render services to a particular patient for workers' compensation purposes is different than the hospital's billed rates,[17] and, therefore, that there is a direct conflict between these two schemes, there is clear evidence that the hospital rates control.[18]

The following evidence compels this conclusion. As previously acknowledged, at no time since the phrase "actually costs" was added to the workers' compensation statutory scheme in 1921 has the legislature defined in that scheme what actual costs for hospital services means or encompasses. Nor has the legislature provided any guidance or mechanism by which a commissioner should determine what a hospital's actual costs would be for providing care to a particular patient.[19] Although assessing such costs might have been a relatively straightforward endeavor in the early part of the twentieth century, when costs were based on a per diem or weekly flat rate depending on the ward of the hospital in which a patient was placed; see *Burge* v. *Stonington*, supra, 219 Conn. 585–87; commissioners are ill equipped to make such assessments given the contemporary complexity and scope of hospital services. In the absence of such guidance and in the face of the complexities of hospital services, leaving such determinations to each commissioner on an ad hoc, case-by-case basis could yield widely inconsistent results.

Consistent with these considerations, in other instances in which the legislature has intended for an employer's liability for medical costs to be assessed on a basis other than what the provider otherwise would charge the general public, it has specified the tools by which to make such assessments. For example, in 1993, the legislature gave the chairman of the commission the power to establish a practitioner fee schedule, with input from specified parties in interest. Public Acts 1993, No. 93-228, § 4; see also General Statutes § 31-294d (d) (liability for costs "in the case of state humane

institutions . . . shall be the per capita cost as determined by the Comptroller under the provisions of section 17b-223"); General Statutes § 19a-673 (b) (precluding hospitals from collecting from low income uninsured patient more than "the cost of providing services," defined in subsection [a] [1] as "a hospital's published charges at the time of billing, multiplied by the hospital's most recent relationship of costs to charges as taken from the hospital's most recently available annual financial filing with the [Office of Health Care Access]"). Similarly, in 2014, the legislature gave the chairman of the commission the power to establish formulas for determining an employer's liability for hospital care, using a multiplier of a hospital's right to reimbursement for services covered by Medicare for most costs. P.A. 14-167; see *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 541, 494 A.2d 555 (1985) ("a subsequent legislative act may throw light on the legislative intent of a former related act" [internal quotation marks omitted]). Notably, like hospital rates under chapter 368z of the General Statutes, such fee schedules are published so that the employer and its insurer can have notice of their potential liability.[20] General Statutes § 31-280 (b) (11) (B) (practitioner fee schedule shall be published annually); General Statutes (Rev. to 2013) § 31-294d (e), as amended by P.A. 14-167 (hospital formulas shall be published annually).

There is no gap in parameters for determining hospital costs, however, if such rates are controlled by the public health scheme. As explained in part I of this opinion, since 1973, the legislature has prescribed what hospitals must charge to the general public—either the hospital commission approved rates; P.A. 73-117; DRG rates; P.A. 88-357, § 3; or the hospital's self-determined published rates. General Statutes § 19a-646. Indeed, such determinations are made by entities that have the resources and the expertise to properly do so.

Furthermore, having commissioners make actual cost determinations leads to certain problems that do not arise if the hospitals' rates control. First, because a hospital may expose itself to a civil penalty by accepting payment below its published rate except as specifically provided; see General Statutes § 19a-681 (c); it is reasonable to expect that a hospital might seek to collect any deficiency arising from such an assessment from the workers' compensation claimant to avoid such penalties. There is no statutory provision precluding hospitals from doing so. Cf. P.A. 88-357, § 3 (providing that workers' compensation payers shall pay DRG rates and further providing that "in workers' compensation cases all charges for hospital services resulting from employment related injuries or diseases shall be solely the responsibility of the employer or carrier, and no claim shall be made against the injured employee for all or part of a charge").[21] Such a result would clearly contravene the remedial purposes of the act. See *Gartrell* v.

*Dept. of Correction*, 259 Conn. 29, 42, 787 A.2d 541 (2002) ("[i]n appeals arising under workers' compensation law, we must resolve statutory ambiguities . . . in a manner that will further the remedial purpose of the act" [internal quotation marks omitted]).

Second, for insurers that have negotiated their own rate agreements with hospitals, as authorized under chapter 368z, there would be a potential conflict between those agreements and the "actually costs" language. Although the 2014 amendment to § 31-294d ensures that negotiated rates control over the general rates prescribed under the new scheme, there previously was no such exception. See General Statutes (Rev. to 2013) § 31-294d (d) (2), as amended by P.A. 14-167 (prescribing liability "unless the employer and hospital or ambulatory surgical center have otherwise negotiated to determine the liability of the employer for hospital or ambulatory surgical center services required by this section"). Interestingly, in support of its argument that the "actually costs" regime is a workable one, Electric Boat noted that, in practice, rather than provide payers with actual cost information, hospitals have simply negotiated their bills. While this may be a workable practical result were we to conclude that the actual costs standard applies, it is contrary to Electric Boat's interpretation of the statute: if the actual costs standard applies, there is no room for negotiated rate agreements to control because § 31-294d did not recognize the enforceability of negotiated rate agreements until the 2014 amendments to the statute.

Third, giving effect to the actual cost language as interpreted by Electric Boat could cause a conflict with lien provisions in the Workers' Compensation Act. Under these provisions, an employer's group health insurer is required to pay benefits to an injured employee prior to a determination on the employee's contested workers' compensation claim, but is entitled to a lien against the workers' compensation award for benefits it has paid. See General Statutes §§ 31-299a (b) and 38a-470 (b). These provisions thus ensure that the health insurer has reimbursement rights against an employer or its compensation carrier when it pays for medical treatment that is later shown to have been caused by a compensable injury. See *Bilodeau* v. *Bristol Assn. for Retarded Citizens*, No. 4245, CRB-6-00-5 (May 29, 2001). The health insurer would presumably have a lien for the *full cost* of hospital care, i.e., the hospital's published rates (or a negotiated rate), creating a potential conflict if § 31-294d (d) requires that any compensation award only account for whatever it "actually costs" a hospital to provide care to the claimant employee.

With respect to the final textually based consideration, we conclude that the aspect of the 2014 revision on which Electric Boat relies does not yield persuasive textual evidence that the legislature intended for com-

missioners to make individual actual cost determinations. Although the 2014 amendment provides that, prior to the date the liability of the employer is established pursuant to the new Medicare based formulas, "the liability of the employer for hospital service shall be the amount it actually costs the hospital to render the service, as determined by the commissioner"; General Statutes (Rev. to 2013) § 31-294d (d), as amended by P.A. 14-167; the retention of the phrase "actually costs" may simply indicate that the legislature intended to maintain the status quo, whatever that is, until the new formulas apply. Notably, the legislature was made aware of the litigation in the cases presently before this court and the competing views as to the correctness of the commissioner's decision; see Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 2014 Sess., pp. 138, 186, 582; yet no legislator expressed a view that the commissioner's decisions were incorrect, nor was there a single comment indicating that this part of the amendment was in any way clarifying. Cf. P.A. 88-357; 31 H.R. Proc., supra, pp. 8329–30, remarks of Representative Gionfriddo (noting that workers' compensation amendment regarding DRG rates was "clarifying in nature").

Deeming the hospital rates controlling is also consistent with the policies underlying both statutory schemes. As for the policies underlying the Workers' Compensation Act, requiring employers to pay a hospital's billed rates or negotiated rates as provided under chapter 368z is consistent with the original intent of that act to require that employers pay the same rates as the general public. See *Burge* v. *Stonington*, supra, 219 Conn. 587–88; *Covey* v. *Honiss Oyster House, Inc.*, supra, 117 Conn. 284. It is also consistent with the underlying purpose of the Workers' Compensation Act to provide prompt and efficient resolution in any workers' compensation proceeding; see *Pietraroia* v. *Northeast Utilities*, 254 Conn. 60, 74, 756 A.2d 845 (2000); because requiring employers to pay the hospital's published rates would avoid a mini-trial for determining what actual costs are in every instance in which an injured employee receives hospital care. Additionally, reducing health care costs—the purpose of the current hospital deregulation scheme—is consistent with recent workers' compensation reform that was aimed at reducing costs to employers. See 37 H.R. Proc, Pt. 2, 1994 Sess., pp. 711, 713, remarks of Representative Joseph Courtney (discussing possibility of cost savings from deregulating hospitals); 36 H.R. Proc., Pt. 18, 1993 Sess., p. 6145, remarks of Representative Michael P. Lawlor (purpose of 1993 revisions to Workers' Compensation Act was to "effect a dramatic decrease in the cost of workers' compensation in Connecticut").

We recognize that, as a rule of statutory construction, we generally do not read a statute so as to render any part of it superfluous; *Lopa* v. *Brinker International*,

*Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010); which largely appears to be the result of deeming chapter 368z controlling over the "actually costs" language of § 31-294d (d). We are not persuaded, however, that this rule counsels in favor of a different construction for several reasons, in addition to the aforementioned considerations. Notably, the legislature previously has retained the "actually costs" language in the Workers' Compensation Act even when it expressly provided that a different rate would control: in 1988, when it amended § 31-294 to provide that the DRG rates would apply in workers' compensation cases. P.A. 88-357, § 19 ("the liability of the employer for hospital service shall be the amount it actually costs the hospital to render the service, such amount to be determined by the commissioner except . . . in cases for which a standard fixed charge per case has been established pursuant to [the DRG act], liability shall be the amount charged by the hospital using a fee schedule based on such fixed charge per case"). Perhaps the legislature assumed that there might still be a legitimate field of operation for actual cost determinations following hospital regulation, and deregulation, and retained this language to account for such a possibility.[22] In addition, the legislature has retained and reenacted other language in § 31-294d regarding an employer's liability for payment of medical costs that appears to be superfluous and indeed anachronistic. Section 31-294d (d) still refers to the employer's pecuniary liability for medical costs as being "limited to the charges that prevail in the same community or similar communities for similar treatment of injured persons of a like standard of living when the similar treatment is paid for by the injured person." The phrase "like standard of living" was relevant when the workers' compensation scheme was created in 1913, when low income wage earners were billed at below cost rates when paying for their own medical or hospital care. Since 1993, however, medical costs have been dictated by a practitioner fee schedule. Public Acts 1993, No. 93-228, § 4. We can only speculate that the legislature has retained anachronistic language in both circumstances either because this statute is the only section of the Workers' Compensation Act that imposes liability on the employer to pay hospital and medical costs or because the legislature assumes that there is some undetermined, legitimate field of operation for that language.

With respect to the reserved issue, we are persuaded that, in the absence of a negotiated agreement pursuant to § 19a-646, a workers' compensation commissioner determines an employer's liability for hospital services on the basis of the hospital's filed rates that it is required to charge "any payer" under § 19a-646 (b), and, accordingly, these cases are remanded to the board with direction to affirm the decisions of the commissioner.

No costs or fees shall be taxed in this court to

either party.

In this opinion the other justices concurred.

[1] This reservation originally involved four decisions appealed to the board: *Caraballo* v. *Electric Boat Corp.*, No. 5785, CRB 2-12-10 (May 9, 2013); *Gray* v. *Electric Boat Corp.*, No. 5786, CRB 2-12-10 (May 9, 2013); *Erickson* v. *United Parcel Service*, No. 5788, CRB 2-12-10 (May 9, 2013); and *Thompson* v. *J & J Properties*, No. 5787, CRB 2-12-10 (May 9, 2013). The appeals were jointly reserved to the Appellate Court pursuant to General Statutes § 31-324, and were thereafter transferred to this court. The appeals in *Erickson* v. *United Parcel Service* and *Thompson* v. *J & J Properties* were withdrawn before oral argument, and, accordingly, they are not before this court.

[2] As we explain later in this opinion, P.A. 14-167 created a new, comprehensive scheme for determining an employer's liability for hospital costs. The cases on appeal involve hospital services for injuries sustained by employees in 1997 and 2006, for which the employees were subsequently hospitalized. We note that the 1997 and 2005 revisions of § 31-294d (d) are identical, and, for convenience, we refer to the 2005 revision throughout this opinion, except as otherwise indicated.

[3] Although § 19a-646 has been amended several times since the events underlying the present appeals; see, e.g., Public Acts 2012, No. 12-170, § 6; those amendments have no bearing on the merits of these appeals. In the interest of simplicity, we refer to the current revision of the statute.

[4] Unlike in other cases arising pursuant to General Statutes § 31-324, the board in this case did not formulate questions for the opinion of the Appellate Court or this court. Cf. *Barton* v. *Ducci Electrical Contractors, Inc.*, 248 Conn. 793, 797–98, 730 A.2d 1149 (1999). The only questions that appear in the record are those formulated by the employer for appeal from the commissioner to the board. Those questions were: "[1] Can . . . § 31-294d (d), which provides that the employer's liability for hospital services is 'the amount it actually costs the hospital to render the service, as determined by the . . . commissioner,' be harmonized with . . . § 19a-646 (b), which . . . requires hospitals to charge the employer at the hospital's published rates? [2] Does § 31-294d (d) trump § 19a-646 (b) for workers' compensation cases? [and] [3] Does *Burge* . . . lack any continuing viability or precedential value because of the contrary actions by the legislature in 1991 and since?" A fourth issue, regarding whether the commissioner should have granted a motion to correct, is not relevant to this appeal. For simplicity, we reframe the reserved issue as follows: in determining an employer's liability for hospital costs in workers' compensation cases, does § 31-294d (d) or § 19a-646 (b) control?

[5] This court also defers to an agency's interpretation when the statute previously has been subjected to judicial scrutiny. *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 746, 99 A.3d 1114 (2014). Although the phrase actually costs was subjected to such scrutiny in *Burge*, neither this court nor the board has considered the effect of various subsequent amendments to the public health scheme.

[6] In its brief to this court, Electric Boat argued that it relied on the "plain language" of § 31-294d (d) in support of its argument that the "actually costs" language controls, but at oral argument, counsel for Electric Boat agreed that "there is no question" that legislative history "comes into play" in resolving this issue. Both parties relied extensively on legislative history in their briefs and at oral argument, and we agree that it is appropriate to consider extratextual evidence in our resolution of this issue.

[7] See also *Spencer* v. *New Haven Rendering Co.*, 4 Conn. Comp. Dec. I-229 (1921) ("[a]bout fifty [percent] of the cases upon the semi-private ward service are [workers'] compensation cases, and said service is sometimes referred to as 'compensation ward service' "); *Christophson* v. *Turner Construction Co.*, 1 Conn. Comp. Dec. 591, 593 (1916) (hospital's "custom is to put [workers' compensation] cases in a semi-private ward at a rate of [$10] per week plus doctor's bills; at this rate [the hospital] does not consider them profitable or desirable and treats them as a matter of duty, not choice").

[8] Interestingly, under the 1973 act, the state's liability was limited to the "actual cost" of the services provided, a term defined in that act as "the current *average* cost per inpatient day of care . . . computed in accordance with accepted principles of hospital cost reimbursement." (Emphasis added.) P.A. 73-117, § 23 (c). A separate body, a hospital committee, determined the state's liability for hospital care; P.A. 73-117, § 22; giving "due consideration to allowances for fully or partially unpaid bills, requirements for working capital and cost of development of new services, including

additions to and replacement of facilities and equipment." P.A. 73-117, § 23 (c).

[9] At the time of the administrative proceedings underlying the appeal in *Burge*, the reviewing body was the Compensation Review Division, which subsequently was renamed the Compensation Review Board. See Public Acts 1991, No. 91-339, § 20. For convenience, we also refer to the former as the board.

[10] The board applied its rule from *Tanner* in several other cases. See, e.g., *Delaney* v. *Camelot Nursing Home*, No. 1049, CRD-2-90-6 (February 7, 1991); *Burdick* v. *Frito-Lay, Inc.*, No. 1048, CRD-2-90-6 (February 7, 1991); *Burge* v. *Stonington*, No. 1042, CRD-2-90-6 (June 29, 1990); *Gervais* v. *Atlantic Builders*, No. 1046, CRD-2-90-6 (June 29, 1990).

[11] Before 1991, § 31-294 addressed several issues in one section in addition to employer liability for medical and hospital costs including, inter alia, issues of notice to the employer and the time limit for filing a claim. Public Act 91-32 resulted in the reorganization of these numerous unrelated topics into several statutes, some, like § 31-294d, with several subsections. See P.A. 91-32, §§ 11, 12. During the period of regulation of hospital rates, the legislature amended § 31-294 on numerous occasions with regard to technical and substantive matters unrelated to the employer's liability for medical or hospital costs or the actually cost language. See Public Acts 1980, No. 80-124, § 5; Public Acts 1981, No. 81-472, § 67; Public Acts 1982, No. 82-472, § 108; Public Acts 1985, No. 85-133, § 2; Public Acts 1987, No. 87-160, § 1; Public Acts 1988, No. 88-357, § 19; Public Acts 1989, No. 89-371, § 22. After this court's decision in *Burge* and the 1991 reorganization of the Workers' Compensation Act, the legislature amended § 31-294d (d) multiple times, also unrelated to employer liability for medical or hospital costs. See Public Acts 1991, No. 91-339, § 48; Public Acts 1998, No. 98-160; Public Acts 2000, No. 00-99, § 81; Public Acts 2001, No. 01-85, § 2.

[12] Electric Boat contends that, because the only issue presented to the court in *Burge* was whether the DRG rates applied, a matter resolved in part II of that decision, it was unnecessary to first consider whether the creation of the hospital commission and its regulation of hospital costs conflicted with the "actually costs" language of § 31-294.

[13] P.A. 91-32; see also Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 1991 Sess., p. 17, remarks of Workers' Compensation Commissioner John Arcudi ("the purpose of the bill [is] not to change substance, but to try to simplify language . . . if possible").

[14] General Statutes (Rev. to 2013) § 31-294d, as amended by P.A. 14-167, provides in relevant part: "(d) (1) The pecuniary liability of the employer for the medical and surgical service required by this section shall be limited to the charges that prevail in the same community or similar communities for similar treatment of injured persons of a like standard of living when the similar treatment is paid for by the injured person. *Prior to the date the liability of the employer is established pursuant to subdivision (2) of this subsection, the liability of the employer for hospital service shall be the amount it actually costs the hospital to render the service, as determined by the commissioner,* except in the case of state humane institutions, the liability of the employer shall be the per capita cost as determined by the Comptroller under the provisions of section 17b-223. All disputes concerning liability for hospital services in workers' compensation cases shall be settled by the commissioner in accordance with this chapter.

"(2) Commencing ninety days after the formulas established by the chairman of the Workers' Compensation Commission have been published pursuant to subsection (e) of this section, unless the employer and hospital or ambulatory surgical center have otherwise negotiated to determine the liability of the employer for hospital or ambulatory surgical center services required by this section, the liability of the employer for hospital or ambulatory surgical center services shall be: (A) If such services are covered by Medicare, limited to the reimbursements listed in such formulas published pursuant to subsection (e) of this section, or (B) if such services are not covered by Medicare, determined by the chairman, in consultation with employers and their insurance carriers, self-insured employers, hospitals, ambulatory surgical centers, third-party reimbursement organizations and other entities as deemed necessary by the Workers' Compensation Commission.

"(e) Not later than January 1, 2015, the chairman of the Workers' Compensation Commission shall, in consultation with employers and their insurance carriers, self-insured employers, hospitals, ambulatory surgical centers, third-party reimbursement organizations and other entities as deemed neces-

sary by the Workers' Compensation Commission, establish and publish Medicare-based formulas, when available, to set the liability of employers for hospital and ambulatory surgical center services required by this section that are covered by Medicare. After the initial publication of such formulas, the chairman shall publish such formulas on each January first thereafter. . . ." (Emphasis added.)

[15] "The doctrine of repeal by implication is applied when two enactments of the same legislative body are irreconcilable . . . . A statute which is repealed by implication is legally eliminated. Repeal of the repealing statute does not revive the repealed law. . . . The legislature must expressly reenact a statute which has been repealed by implication to render it valid and enforceable again.

"The doctrine of preemption, on the other hand, is applied where enactments of two unequal legislative bodies (e.g., Federal and State) are inconsistent. Where a statute is preempted, there is no repeal of that statute. Rather, the subordinate legislative body's enactment is suspended and rendered unenforceable by the existence of the superior legislative body's enactment. This being so, the repeal of the preempting statute revives or reinstates the preempted statute without express reenactment by the legislature." (Citation omitted; emphasis omitted.) *Lily Lake Road Defenders* v. *McHenry*, supra, 156 Ill. 2d 8. We note that we have not previously determined whether § 1-1 (s), which provides for revival of a repealed statute in a manner consistent with this Illinois case, applies to implicitly repealed statutes.

[16] A payer is defined as "any person, legal entity, governmental body or eligible organization that meets the definition of an eligible organization under 42 USC Section 1395mm (b) of the Social Security Act, or any combination thereof, *except for Medicare and Medicaid* which is or may become legally responsible, in whole or in part for the payment of services rendered to or on behalf of a patient by a hospital. Payer also includes any legal entity whose membership includes one or more payers and any third-party payer . . . ." (Emphasis added.) General Statutes § 19a-646 (a) (4).

[17] For purposes of this appeal only, the hospitals have agreed that the figures calculated by Fairpay should be treated as the actual costs of services for the cases at issue. The Connecticut Hospital Association as amicus curiae contends, however, that a hospital's billed rates are consistent with what hospital services "actually cost" because they reflect the actual cost of being able to provide such services to patients, accounting for, inter alia, overhead and cost shifting due to the underpayment for services from Medicare and Medicaid. We note that there is some support for such an interpretation in the history of the public health scheme; see, e.g., P.A. 73-117, § 23 (limiting state's liability for hospital services to "actual cost," defined to include "allowances for fully or partially unpaid bills, requirements for working capital and cost of development of new services, including additions to and replacement of facilities"); but, in accordance with the parties' stipulated facts, we assume that what it "actually costs" a hospital to render services to a particular patient for workers' compensation purposes is different than the hospital's billed rates.

[18] As did the commissioner, we reject outright Electric Boat's contention that the statutes are reconcilable because § 19a-646 regulates the duty of hospitals to charge for their services while § 31-294d regulates the duty of employers to pay for those services. This construction is illogical, especially when considered in light of the penalty provision in § 19a-681 (c), and finds no support in the legislative history of either statutory scheme or in any workers' compensation decision. Electric Boat would have us assume that, when § 19a-646 dictates that "no hospital shall provide a discount . . . to any payer," it actually means that, although hospitals must *charge* certain rates, they may, with a wink and a nod, accept payments that deviate from those published rates even in the absence of a negotiated agreement without implicating the penalty prescribed in § 19a-681 (c). We are not convinced that the legislature intended such a counterintuitive result.

[19] Electric Boat also has not provided any workable definition for how actual costs might be determined. Indeed, at oral argument, counsel for Electric Boat argued that what actual costs means is not an issue before this court and would need to be litigated in future cases.

[20] Because a hospital's detailed schedule of its charges is required to be on file with the Office of Health Care Access; see General Statutes § 19a-681 (b); we are not persuaded by Electric Boat's argument that, under the public health scheme, compensation payers "would have no way to know the amount of liability they might face in any given case . . . ."

[21] We note that § 31-279-9 (e) of the Regulations of Connecticut State

Agencies provides, as an obligation of attending physicians, that "[a]ll charges for medical, surgical, hospital and nursing services . . . shall be solely the responsibility of the employer or carrier, and no claim will be made against the injured employee for all or part of a fee." It does not seem, however, that this provision, which has been effective since 1973, applies to hospital billing as opposed to an individual physician's charges for services that may be provided in a hospital, and, in fact, in 1988, Workers' Compensation Commissioner John Arcudi requested that the provision be added to the DRG act to make clear that a hospital may not make a claim against the injured employee for any part of a hospital fee. Conn. Joint Standing Committee Hearings, supra, p. 166; see also P.A. 88-357, § 3. That provision was removed with the repeal of the DRG act in 1989.

[22] At oral argument, counsel for the hospitals suggested that the actual cost standard may be applicable when an out-of-state hospital, not subject to Connecticut's hospital scheme, provides care. We need not address in this case whether and to what extent the "actually costs" language may apply in any other contexts.

---